UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JUDITH BARRIGAS, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 17-cv-10232-ADB |
| | * | |
| UNITED STATES OF AMERICA; THE | * | |
| HOWARD STERN PRODUCTION | * | |
| COMPANY; and HOWARD STERN, | * | |
| | * | |
| Defendants. | * | |

**MEMORANDUM AND ORDER ON MOTIONS TO DISMISS**

BURROUGHS, D.J.

A telephone conversation between Plaintiff and an agent of the Internal Revenue Service ("IRS") concerning her tax liability and repayment plan partially aired during a segment of The Howard Stern Show on Sirius XM satellite radio. Plaintiff asserts various causes of action against the Howard Stern Production Company and Howard Stern (collectively, the "Stern Defendants") and the United States relating to this alleged invasion of privacy. Currently pending before the Court are the Stern Defendants' motion to dismiss for failure to state a claim [ECF No. 30] and the United States' partial motion to dismiss for lack of subject matter jurisdiction or improper venue. [ECF No. 34]. For the reasons that follow, the Stern Defendants' motion is <u>GRANTED</u>, and the United States' motion is <u>GRANTED</u> as to Count I. Plaintiff's case may proceed with respect to Count II against the United States.

I.      **BACKGROUND**

A.      **Amended Complaint and Other Sources**

The following summary of facts is drawn from the operative complaint [ECF No. 5] ("Amended Complaint"), the well-pleaded allegations of which are taken as true for purposes of

evaluating the motions to dismiss. See Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). Ordinarily, the Court does not consider documents that were not attached to the complaint or expressly incorporated therein. Id. Courts have, however, "made narrow exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to [plaintiff's] claim; or for documents sufficiently referred to in the complaint." Id.; see Miss. Pub. Employees' Ret. Sys. v. Bos. Sci. Corp., 523 F.3d 75, 86 (1st Cir. 2008).

The Stern Defendants filed an audio recording of The Howard Stern Show segment at issue, and the Stern Defendants and the United States each filed separate transcripts of that segment. [ECF Nos. 32, 33, 37]. Counsel for the Stern Defendants avers that on May 16, 2017, he informed Plaintiff's counsel that the Stern Defendants intended to submit the recording without a motion to seal, and that Plaintiff's counsel did not respond prior to the filing of the motion to dismiss. [ECF No. 32 at ¶ 3]. Plaintiff did not object in her opposition briefing to the Court's consideration of the recording or the transcripts, and she has not otherwise disputed their accuracy or authenticity. Because the content of this segment of The Howard Stern Show is central to the dispute and is referenced throughout the Amended Complaint, the Court will consider the recording and transcripts in reviewing whether Plaintiff has plausibly stated her claims. See Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d 1081, 1103−04 (10th Cir. 2017) (district court properly considered a recording attached to defendant's motion under Rule 12(b)(6) where the recording was referenced in the complaint, was central to the claims, and there was no dispute as to its accuracy or authenticity); Speaker v. U.S. Dep't. of Health & Human Servs. Ctrs. For Disease Control & Prevention, 623 F.3d 1371, 1379−80 (11th Cir. 2010) (because videos attached to motion to dismiss were not disputed and were central to plaintiff's

claim, court could properly rely on them at the motion to dismiss stage); Eggleston v. Daniels, No. 15−11893, 2016 WL 4363013, at *4 n.4 (E.D. Mich. Aug. 16, 2016) (considered video recording of television show that was "referred to in the complaint and [was] central to Plaintiff's claims" at the motion to dismiss stage); Jackson v. Gatto, No. 13−02516, 2014 WL 2743130, at *3 (D. Colo. June 17, 2014) (audio/video recording and transcript attached to motion to dismiss, where neither side challenged its authenticity, was within scope of Rule 12(b)(6)).

**B.      Summary of Facts**

On May 19, 2015, Plaintiff called an IRS customer service center to discuss whether her tax refund for the 2014 tax year had been incorrectly applied toward her 2011 and 2012 tax liabilities, which were already subject to a repayment agreement. Am. Compl. ¶¶ 15−16. Plaintiff's telephone call was routed to an IRS customer service agent, Jimmy Forsythe ("Agent Forsythe"), who, unbeknownst to Plaintiff, had been on hold with the Sirius XM satellite radio program, The Howard Stern Show, using a different telephone line. Id. ¶¶ 18−23. At some point during Agent Forsythe's conversation with Plaintiff, The Howard Stern Show took Agent Forsythe off hold. Id. ¶¶ 24−25. Apparently unaware that he was on the air, Agent Forsythe continued to speak to Plaintiff regarding her tax liability and repayment plan, and, toward the end of the conversation, mentioned Plaintiff's telephone number. Id. ¶¶ 25−26. The Howard Stern Show segment, however, only captured Agent Forsythe's side of his conversation with Plaintiff. Neither Plaintiff's voice nor her statements were audible during the broadcast. [ECF Nos. 32, 37]. Although Plaintiff's telephone call to Agent Forsythe lasted approximately 45 minutes, only about three minutes of their conversation aired. Am. Compl. ¶ 18. The following

are Agent Forsythe's statements to Plaintiff that were broadcasted:[1]

AGENT FORSYTHE: $71 due on the 20th.[2] [ECF No. 37 at 2:8]

AGENT FORSYTHE: Let's see. [ECF No. 32 at 4:12].

AGENT FORSYTHE: I know. I mean, it's like—right now, as of the 1st of June, it's $1,228.26 minus the—that $100. I mean, that could take a year to pay off. Id. at 4:19−22.

AGENT FORSYTHE: It should remain the same. So the interest rate will remain the same but when you make the payment it's going to go towards the tax first. Id. at 5:4−7.

AGENT FORSYTHE: So basically the way it works is when you're paying us, it's always going towards the tax until the tax is reduced down to zero. Id. at 5:9−12.

AGENT FORSYTHE: —and then it will go towards the penalty. And when the penalty's reduced down to zero, then it will bring—then it—the payments will go towards the interest and that goes down to zero. Id. at 5:14−18.

AGENT FORSYTHE: If you pay the pay penalty it's half. Id. at 5:23−24.

AGENT FORSYTHE: It's one-half of one percent of the total amount due—of the total tax due and the interest is three percent yearly. Id. at 6:2−4.

AGENT FORSYTHE: —compounded daily. Id. at 6:6.

AGENT FORSYTHE: 71. Id. at 6:10.

AGENT FORSYTHE: Yeah. It won't take effect until next month. Id. at 6:12−13.

AGENT FORSYTHE: But, you know, we can send a referral over to your direct deposit—direct debit liaison and they'll change it. Id. at 6:16−18.

AGENT FORSYTHE: No. We can do it over the phone. Id. at 6:21−22.

AGENT FORSYTHE: So are you going to increase it to 100?[3] Still on the same date? Id. at 6:24−25.

---

[1] The citations reflect the page number and line number of the transcript provided by the Stern Defendants at ECF No. 32 or by the United States at ECF No. 37.

[2] The Stern Defendants' transcript states that Agent Forsythe said, "$71,200 on the 20th." [ECF No. 32 at 4:6]. Based on the Court's review of the recording, and in the context of the segment as a whole, "$71 due on the 20th" appears to be accurate.

[3] The United States' transcript states that Agent Forsythe said, "So you're going to first do a hundred." [ECF No. 37 at 5:7].

AGENT FORSYTHE: Okay. Let's get this. <u>Id.</u> at 7:4.

AGENT FORSYTHE: I believe it's direct deposit, direct debit. <u>Id.</u> at 7:11−12.

AGENT FORSYTHE: —statements. <u>Id.</u> at 7:15.

AGENT FORSYTHE: Again, with your bills, when it is paid off it will let you know. <u>Id.</u> at 7:19−20.

AGENT FORSYTHE: Yeah. <u>Id.</u> at 7:23.

AGENT FORSYTHE: Yeah. I was going to send that as well. <u>Id.</u> at 8:3−4.

AGENT FORSYTHE: Is your phone number still [omitted][4]? <u>Id.</u> at 8:8−9.

AGENT FORSYTHE: You're welcome. <u>Id.</u> at 8:16.

At this point, Agent Forsythe began directly addressing the hosts of The Howard Stern Show. He acknowledged that he was a collector "for the government" before the conversation between the hosts and Agent Forsythe turned to an unrelated topic. [ECF No. 32 at 9:7−9]. While Agent Forsythe's statements above were airing, the hosts of The Howard Stern Show provided commentary. They attempted to get Agent Forsythe's attention, *i.e.*:

ROBIN QUIVERS: Jimmy? [ECF No. 32 at 4:4].

HOWARD STERN: Jimmy? <u>Id.</u> at 4:5.

ROBIN QUIVERS: Hello? <u>Id.</u> at 4:14.

They speculated as to the topic of his conversation with Plaintiff, *i.e.*:

ROBIN QUIVERS: What is he doing? Making a transaction? <u>Id.</u> at 4:9−10.

HOWARD STERN: High finance. <u>Id.</u> at 4:23.

HOWARD STERN: I see. He's at work. <u>Id.</u> at 5:8.

HOWARD STERN: He's doing collections. <u>Id.</u> at 5:13.

---

[4] Given that there is no dispute over the telephone number that Agent Forsythe recited, and that the number may still be associated with Plaintiff, the Court need not repeat it again.

They noted the complexity of the subject matter, *i.e.*:

> HOWARD STERN: Boy, [I've] got no head for numbers. Id. at 5:19−20.

> ROBIN QUIVERS: No. I don't know what he's talking about at all. Id. at 5:21−22.

> HOWARD STERN: I'm not sure what he's saying but it sounds like a raw deal. Id. at 5:25−6:1.

> HOWARD STERN: I think I'm in math. I'm in math class and I'm flunking because I don't know one thing he's saying. Id. at 7:1−3.

The hosts also expressed disinterest in Agent Forsythe's work, *i.e.*:

> HOWARD STERN: [B]y the way, this is the most boring job ever. Id. at 7:13−14.

> HOWARD STERN: I'd rather live in my parents' basement if I had to do this. Id. at 7:16−17.

> HOWARD STERN: [You've] got the most boring job, dude. Id. at 9:1−2.

They did not comment specifically on the person with whom Agent Forsythe was conversing, other than to say to Agent Forsythe once he realized he was on the air:

> ROBIN QUIVERS: What are you doing with that person? What are you paying off? Id. at 9:3−4.

> HOWARD STERN: All I know is that was the most confusing phone call and I still don't know what the guy owes. Id. at 9:13−15.

> ROBIN QUIVERS: I don't know why they need to ask all those questions. They need to pay the bill. Id. at 9:16−18.

> HOWARD STERN: Right. Just give him the bottom line, Jimmy. Stop going through all the math. Id. at 9:19−21.

Plaintiff was unaware that Agent Forsythe had called The Howard Stern Show until she began receiving text messages and telephone calls from unknown individuals that were "harassing in nature" in the days following the broadcast. Am. Compl. ¶¶ 20, 33. She reported the incident to the IRS and to The Howard Stern Show, but the IRS only took action after she reported the incident to a local news station. Id. ¶¶ 34−37. The Howard Stern Show did not

respond to her communications about the incident and a recording of the broadcast was allegedly available on The Howard Stern Show website "for many weeks after the incident." Id. ¶ 39. Plaintiff has suffered "tremendous anxiety," difficulty sleeping and eating, and has sought treatment as a result of the incident. Id. ¶¶ 42−43, 47. She also asserts that the broadcast has detrimentally affected her ability to find employment in her field of "business and consulting." Id. ¶¶ 44−46, 48.

## II.     UNITED STATES' MOTION TO DISMISS

Plaintiff asserts claims for negligence and invasion of privacy under the Federal Tort Claims Act ("FTCA") (Count I) and disclosure of tax return information in violation of 26 U.S.C. § 7431 (Count II) against the United States. The United States moves to dismiss Count I for lack of subject matter jurisdiction and for improper venue. The motion only challenges Count II on the ground of improper venue.

### A.     Lack of Subject Matter Jurisdiction

Given that "courts should ordinarily satisfy jurisdictional concerns before addressing the merits of a civil action," the first question is whether the Court has subject matter jurisdiction over Plaintiff's FTCA claims. Feinstein v. Resolution Trust Corp., 942 F.2d 34, 40 (1st Cir. 1991). The United States' challenge to this Court's jurisdiction "accepts the plaintiff's version of jurisdictionally-significant facts as true and addresses their sufficiency, requiring the court to assess whether the plaintiff has propounded an adequate basis for subject-matter jurisdiction." Valentin v. Hosp. Bella Vista, 254 F.3d 358, 363 (1st Cir. 2001). "In performing this task, the court must credit the plaintiff's well-pleaded factual allegations (usually taken from the complaint, but sometimes augmented by an explanatory affidavit or other repository of uncontested facts), draw all reasonable inferences from them in her favor, and dispose of the

challenge accordingly." Id. Plaintiff, as "the party invoking the jurisdiction of a federal court[,] carries the burden of proving its existence." Skwira v. United States, 344 F.3d 64, 71 (1st Cir. 2003) (citation and quotation marks omitted).

Under the FTCA, the United States has consented to a limited waiver of its sovereign immunity, allowing claims to be filed against the United States for damages "caused by the negligent or wrongful act or omission" of a federal government employee while acting within the scope of his or her office or employment, "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). "'As with all waivers of sovereign immunity,' the FTCA must be strictly construed in favor of the government." Gordo-Gonzalez v. United States, 873 F.3d 32, 35 (1st Cir. 2017) (quoting Bolduc v. United States, 402 F.3d 50, 56 (1st Cir. 2005)). This particular waiver is also subject to several statutory exceptions. Id. (citing 28 U.S.C. § 2680(a)−(n)). "[B]ecause 28 U.S.C. § 1346(b) provides that federal courts shall have jurisdiction over FTCA claims 'subject to,'" the exceptions found in section 2680, those exceptions "define the limits of federal subject matter jurisdiction in this area." Hydrogen Tech. Corp. v. United States, 831 F.2d 1155, 1161 (1st Cir. 1987).

Section 2680(c), sometimes referred to as the "tax exception," exempts from the FTCA's waiver of sovereign immunity "[a]ny claim arising in respect of the assessment or collection of any tax or customs duty . . . ." 28 U.S.C. § 2680(c). The tax exception has been "interpreted broadly," Tempelman v. Beasley, 43 F.3d 1456, 1994 WL 708145, at *1 (1st Cir. Dec. 21, 1994), recognizing that a "wide range of activity by the IRS 'arises in respect of' its collection or assessment of taxes." Clark v. United States, 326 F.3d 911, 913 (7th Cir. 2003); see, e.g., Tempelman, 1994 WL 708145, at *1 (barring plaintiffs' claim that IRS agent conducting audit

maliciously imposed tax liabilities in retaliation for their dissident political views); Jones v.

United States, 16 F.3d 979, 980 (8th Cir. 1994) (covering IRS's "rough and tumble, no-holds-

barred inquiry into the [plaintiffs'] tax practices," including wire taps, personal interviews with

acquaintances and business contacts, and searches home and business locations); Perkins v.

United States, 55 F.3d 910, 913−14 (4th Cir. 1995) (barring wrongful death action where IRS

agent contracted plaintiff's husband to retrieve mining equipment pursuant to an IRS seizure

order and plaintiff's husband died due to asphyxiation in the mine); Feinschreiber v. United

States, No. 01−3628, 2002 WL 1396432, at *1−2 (S.D. Fla. May 24, 2002) (applying tax

exception where IRS audit agent retaliated against plaintiffs by eliminating their expense

deductions, referring their audit to the IRS's criminal division, and causing IRS to send them

humiliating letters). Courts have likewise described the scope of the tax exception as reaching

activities of an IRS agent with a "realistic nexus" to assessing or collecting taxes. Johnson v.

Sawyer, 980 F.2d 1490, 1503 (5th Cir. 1992), opinion vacated on other grounds, 47 F.3d 716

(5th Cir. 1995) (en banc); see Hydrogen Tech. Corp. v. United States, 656 F. Supp. 1126, 1128

(D. Mass. 1987), aff'd, 831 F.2d 1155 (1st Cir. 1987) (citing Formula One Motors, Ltd. v.

United States, 777 F.2d 822, 825 (2d Cir. 1985) (Oakes, J. concurring)) (section 2680(c) would

not apply "if there were no nexus" between the activity complained of and collection activity).

Where "a specific tax debt of a specific taxpayer is at issue," Perkins, 55 F.3d at 915, it is

well-established that the tax exception encompasses activities of an IRS agent that are "even

remotely related" to assessing or collecting taxes, including "unlawful or unauthorized actions."

Hanley v. United States, No. 14−1315, 1994 WL 723678, at *3 (1st Cir. Oct. 5, 1994) (citing

Capozzoli v. Tracey, 663 F.2d 654, 657 (5th Cir. 1981)) (tax exception barred tort claim based

on IRS's failure to process a partnership schedule attached to their tax return); see Perkins, 55

F.3d at 914 ("[R]egulatory violations and torts committed by agents are within the scope of the [tax exception] if they were committed during the course of a tax assessment or collection effort"); Capozzoli, 663 F.2d at 658 (argument that "any tortious or wrongful conduct by an agent cannot, by definition, be in respect of his official duties of assessing or collecting taxes" has been "consistently rejected"); Feinschreiber, 2002 WL 1396432 at *4 (tax exception "even includes an IRS agent's unauthorized tortious acts designed to intentionally and illegally intimidate and harass the taxpayer, so long as they arise out of tax collecting efforts").

Plaintiff argues that Agent Forsythe's telephone call to The Howard Stern Show was plainly outside of his official duties to assess or collect taxes and that the United States fails to cite any cases in which the IRS's conduct was comparable to Agent Forsythe's disclosure of their conversation. The tax exception has, however, barred claims based on privacy violations. In Capozzoli, 663 F.2d at 656, an IRS agent, who was investigating a casualty loss claimed by the plaintiffs on an undeveloped tract of land, photographed the plaintiffs' nearby residence even though it was not the subject of the claim. One of the plaintiffs alleged that she was alone in the residence wearing only her nightclothes when the IRS agent took the photographs. Id. The court rejected plaintiffs' argument that photographing plaintiffs' home, even though it was not the subject of the casualty loss claim, constituted a "tortious invasion of privacy unrelated to his official duties of assessing or collecting taxes." Id. at 657−58; see Perkins, 55 F.3d at 915 (Capozzoli held that the "photography was remotely but sufficiently related to the agent's assessment of [plaintiff's] taxes . . . even though the casualty loss claim did not involve the residence and even if the photography constituted an unauthorized tortious invasion of privacy"). The court recognized that the tax exception has been "interpreted broadly by the courts to preclude suits for damages arising out of the allegedly tortious activities of IRS agents when

those activities were <u>in any way</u> related to the agents' official duties." <u>Capozzoli</u>, 663 F.2d at 658 (emphasis added).

The tax exception has also been applied to the disclosure of information to third parties. The IRS agents in <u>Morris v. United States</u> conducted an audit of plaintiffs' books and then disclosed to plaintiffs' creditors that plaintiffs had an outstanding tax liability. 521 F.2d 872, 874 (9th Cir. 1975). They also harassed and intimidated plaintiffs throughout their collection attempts and unlawfully seized and levied upon their property. <u>Id.</u> Not only did the disclosure of plaintiffs' alleged tax liability lead to their loss of credit and the failure of their business, but after years of investigation and collection activity, the IRS determined that plaintiffs owed no taxes. <u>Id.</u> Although the court acknowledged that the IRS agents' alleged conduct was "deplorable," it held that even assuming, *arguendo*, that the IRS agents' collection activity "was beyond the normal scope of authority and amounted to tortious conduct, . . . the claim falls squarely within the exempted group of tort claims arising out of tax collection efforts." <u>Id.</u>

The Court agrees with Plaintiff that Agent Forsythe's personal telephone call to The Howard Stern Show, and the partial disclosure of his conversation with Plaintiff regarding her taxes, went beyond the scope of his duties as an IRS employee. The tax exception is "meaningless," however, if it does not cover activities that fall outside the scope of an IRS agent's employment. <u>Capozzoli</u>, 663 F.2d at 658; <u>accord</u> <u>Perkins</u>, 55 F.3d at 913. The pertinent question is whether the complained of conduct is remotely related, or bears a nexus, to the assessment or collection of taxes. <u>See</u> <u>Capozzoli</u>, 663 F.2d at 658–59 ("[A]n IRS agent could engage in tortious conduct sufficiently removed from the agent's official duties of assessing or collecting taxes as to be beyond the scope of Section 2680(c), and at the same time sufficiently within the scope of his employment as to give rise to an action against the United States."). Here,

Agent Forsythe called The Howard Stern Show from an IRS service center while he was on duty. He was assisting Plaintiff with her tax related questions at the time of the disclosure, which Plaintiff acknowledges was inadvertent. [ECF No. 49 at 6]. Compare Wilkerson v. United States, 839 F. Supp. 440, 441, 446 (E.D. Tex. 1993) (denying motion to dismiss where there was question of fact as to whether IRS agent's disclosures "were made solely to harass [plaintiff] or ruin [plaintiff's] business"). Although there may be some circumstances under which a disclosure of an individual's tax related information may fall outside of the broad reach of the tax exception, Agent Forsythe's inadvertent disclosure made while he was simultaneously answering Plaintiff's questions about her tax liability and repayment plan is, at the very least, remotely related to tax assessment and collection. Thus, the alleged tortious activities of Agent Forsythe fall within the scope of the tax exception and are not actionable under the FTCA. Plaintiff's FTCA claims against the United States are therefore dismissed.[5]

**B.      Improper Venue**

With respect to the remaining claim against the United States under 26 U.S.C. § 7431, the United States challenges whether Plaintiff can establish that venue is proper in this district, seemingly on the sole basis that the Amended Complaint states that Plaintiff is an individual "now or formerly" residing in Massachusetts. See 28 U.S.C. § 1391(e) (civil action against United States may be brought in any judicial district in which a defendant resides, a substantial part of the events or omissions giving rise to the claim occurred, or plaintiff resides, if no real

---

[5] Because the Court lacks subject matter jurisdiction over the FTCA claims, it does not reach the United States' preemption argument or undertake a choice-of-law analysis to determine whether New York or Massachusetts law governs Plaintiff's FTCA claims. Assuming that Massachusetts law applied, the merits discussion below concerning the claims against the Stern Defendants would likely apply in a substantially similar manner to the merits of the claims against the United States.

property is involved). "Once a defendant has raised the issue of venue through a motion to dismiss, the burden falls on the plaintiff to demonstrate that venue is proper." <u>Berklee Coll. of Music, Inc. v. Music Indus. Educators, Inc.</u>, 733 F. Supp. 2d 204, 211 n.49 (D. Mass. 2010). "In evaluating a motion to dismiss for improper venue under [Fed. R. Civ. P. 12(b)(3)], allegations in the complaint are accepted as true and the record includes affidavits and documentation." <u>Gill v. Nakamura</u>, No. 14–13621, 2015 WL 5074475, at *2 (D. Mass. July 24, 2015); <u>see</u> <u>Universal Trading & Inv. Co. v. Bureau of Representing Ukrainian Interests in Int'l & Foreign Cts.</u>, 898 F. Supp. 2d 301, 317 (D. Mass. 2012) ("A district court may examine facts outside the complaint to determine whether its venue is proper.").

In opposing the United States' motion, Plaintiff stated in an affidavit that she resided in Massachusetts at the time that the initial complaint was filed, has been a Massachusetts resident for many years, and is currently a Massachusetts resident. [ECF No. 50 at ¶¶ 2–3]. The United States did not press any argument with respect to venue in its reply to Plaintiff's opposition. Based on the allegations in the Amended Complaint and Plaintiff's affidavit, the United States' motion to dismiss for improper venue is <u>DENIED</u>. Plaintiff's case against the United States may proceed with respect to Count II.

## III. STERN DEFENDANTS' MOTION TO DISMISS

Plaintiff asserts claims for negligence (Count IV), invasion of privacy (Count V), and intentional infliction of emotional distress (Count VI) against the Stern Defendants. She also brought a claim for unlawful disclosure of tax return information (Count III), but conceded in her opposition brief that Count III cannot proceed against the Stern Defendants. [ECF No. 46 at 2 n.1]. Accordingly, Count III is dismissed. The Stern Defendants seek dismissal of the remaining counts for failure to state a claim.

To evaluate a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must "accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the pleader's favor." A.G. ex rel. Maddox v. v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013) (quoting Santiago v. Puerto Rico, 655 F.3d 61, 72 (1st Cir. 2011)). The complaint must set forth "a short and plain statement of the claim showing that the pleader is entitled to relief," and should "contain 'enough facts to state a claim to relief that is plausible on its face.'" Id. (quoting Fed. R. Civ. P. 8(a)(2) and Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "To cross the plausibility threshold a claim does not need to be probable, but it must give rise to more than a mere possibility of liability." Grajales v. P.R. Ports Auth., 682 F.3d 40, 44–45 (1st Cir. 2012) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A determination of plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Id. at 44 (quoting Iqbal, 556 U.S. at 679). "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." Hernandez-Cuevas v. Taylor, 723 F.3d 91, 103 (1st Cir. 2013) (quoting Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 14 (1st Cir. 2011)).

"The plausibility standard invites a two-step pavane." Maddox, 732 F.3d at 80. First, the Court "must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." Id. (quoting Morales-Cruz v. Univ. of Puerto Rico, 676 F.3d 220, 224 (1st Cir. 2012)). Secondly, the Court "must determine whether the remaining factual content allows a 'reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Morales-Cruz, 676 F.3d at 224).

## A.      Invasion of Privacy (Count V)

Plaintiff claims that the broadcast of Agent Forsythe's statements concerning her tax information and her phone number violated her right to privacy under the Massachusetts Privacy Act, which provides that "[a] person shall have a right against unreasonable, substantial or serious interference with [his or her] privacy." Mass. Gen. Laws ch. 214, § 1B. As an initial matter, the Massachusetts Privacy Act appears to protect against "intentionally tortious" invasions of privacy. Nelson v. Salem State Coll., 845 N.E. 2d 338, 348 (Mass. 2006) ("public employees may be personally liable for their intentionally tortious conduct under [Mass. Gen. Laws ch. 214, § 1B]"); see Mass. Gen. Laws ch. 258, § 10 (statute excluding intentional torts from Massachusetts Tort Claims Act, including "invasion of privacy"); see also Invasion of Privacy, in CIVIL CAUSES OF ACTION IN MASSACHUSETTS (MCLE, Inc., 2d ed. 2012) ("Invasion of privacy is usually thought of as an intentional tort, although Massachusetts courts do not explicitly state that proposition."). Here, it is not clear that the Stern Defendants disseminated her allegedly private information intentionally. Although they might have become aware during the broadcast that Agent Forsythe was discussing taxes or collections generally, a specific individual was never named in relation to such information, and the telephone number was not disclosed until the final seconds of Agent Forsythe's conversation with Plaintiff. It is unclear how broadcasting the statements of a caller to a radio show, who vaguely discusses tax amounts and repayment terms of an unspecified third party, constitutes an intentional invasion of the third party's privacy.[6]

---

[6] As the Stern Defendants point out, the disclosure of a telephone number might not have sufficiently identified Plaintiff to be actionable under the Massachusetts Privacy Act. At this stage, however, the allegations that Plaintiff's "identity (her phone number)" was disclosed during The Howard Stern Show and that listeners were able to contact her using that number, plausibly alleges that she was identified with the disclosure of tax information.

Even assuming that the Stern Defendants acted intentionally, for instance, by maintaining a publicly accessible recording of the show segment for a few weeks, Plaintiff has not plausibly alleged an unreasonable, substantial, or serious intrusion into highly personal information. To state a claim for invasion of privacy, Plaintiff must prove that there was "[1] a gathering and dissemination of facts of a private nature that [2] resulted in an unreasonable, substantial or serious interference with [her] privacy." Branyan v. Southwest Airlines Co., 105 F. Supp. 3d 120, 126 (D. Mass. 2015) (citing Nelson v. Salem State Coll., 845 N.E.2d 338, 348 (Mass. 2006)). Under the first prong, the facts disseminated must be "highly personal or intimate nature when there exists no legitimate, countervailing interest" for the disclosure. Bratt v. Int'l Bus. Machines Corp., 467 N.E.2d 126, 134 (Mass. 1984). Under the second prong, Plaintiff must show that the disclosure of her information was "both unreasonable and either substantial or serious." Ayash v. Dana-Farber Cancer Inst., 822 N.E.2d 667, 681−82 (Mass. 2005). An interference with an individual's right to privacy that is unreasonable but "only trivial or insubstantial" is not actionable. Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 567 N.E.2d 912, 914 (Mass. 1991).

In a case applying a standard for invasion of privacy that provided "broader protection against disclosure" than does the Massachusetts Privacy Act, Cape Cod Times v. Sheriff of Barnstable Cnty., 823 N.E.2d 375, 382 (Mass. 2005), the Massachusetts Supreme Judicial Court ("SJC") found that disclosing a list of property owners who were delinquent in the payment of their real estate taxes, including their names, addresses, and amounts of delinquencies, did not arise to the level of publicizing "intimate details" of a "highly personal" nature. Atty. Gen. v. Collector of Lynn, 385 N.E.2d 505, 508 (Mass. 1979); see Pottle v. Sch. Comm. of Braintree, 482 N.E.2d 813, 866 n.6 (Mass. 1985) (invasion of privacy standard under the public records

exemption at issue in <u>Collector of Lynn</u> is "a standard more favorable to nondisclosure than [the Massachusetts Privacy Act]"). With regard to the seriousness of the privacy invasion in that case, the SJC recognized that the public disclosure of a list of tax delinquents "does involve some invasion of personal privacy" and that the publication of an individual's name on such a list "would certainly result in personal embarrassment to an individual of normal sensibilities." <u>Collector of Lynn</u>, 385 N.E.2d at 508. The SJC ultimately held, though, that:

> the records of tax delinquents . . . do not disclose such private information as a person's income or his financial relationship with other private persons. The records disclose only whether an owner is meeting his public responsibilities. While an owner of property may have some expectation of privacy in real estate tax records, he does not have the same expectation of privacy concerning his legal obligation as he has in his private financial affairs.

<u>Id.</u> at 508−09. Here, the disclosed tax information was imprecise and only roughly identifiable with a particular individual. Taken in the light most favorable to Plaintiff, the broadcast disclosed that the person with whom Agent Forsythe was speaking had some tax liability and a repayment plan (the details of which included payment by direct deposit, certain due dates, and the allocation of payments between the tax, interest, and penalty portions of the amount due), and had the telephone number mentioned during the segment. Plaintiff's name, social security number, address, or other identifying information were not disclosed. Neither the sound of her voice nor her communications to Agent Forsythe could be heard. The only link between Plaintiff and the disclosure was the telephone number, which she admits was publicly listed and would have required an internet search to identify her. As in <u>Collector of Lynn</u>, 385 N.E.2d at 509, the subject matter of the disclosure was an individual's tax delinquency, as opposed to "private information [such] as a person's income or [his or her] financial relationship with other private persons." There may be circumstances in which the publication of tax related information does

constitute an invasion of privacy under Massachusetts law, but for the reasons stated above, the level of the intrusion was significantly diminished here. Count V is therefore dismissed.

## B.  Negligence (Count IV)

Under Massachusetts law, "[t]o prevail on a negligence claim, a plaintiff must prove that the defendant owed the plaintiff a duty of reasonable care, that the defendant breached this duty, that damage resulted, and that there was a causal relation between the breach of the duty and the damage." Jupin v. Kask, 849 N.E.2d 829, 834–35 (Mass. 2006). "The existence of a legal duty is a question of law determined 'by reference to existing social values and customs and appropriate social policy.'" Adams v. Cong. Auto Ins. Agency, Inc., 65 N.E.3d 1229, 1234 (Mass. App. Ct. 2016) (quoting Jupin, 849 N.E.2d at 832). "The other three elements ordinarily are questions of fact for the jury." Id. Plaintiff asserts that the Stern Defendants have a duty of reasonable care to avoid disseminating "private information about private individuals," Am. Compl. ¶ 74, but does not provide any authority to support the existence of this duty, particularly in the context of a radio show receiving a call from a listener who loosely discusses information about an unnamed third person. "Massachusetts has never recognized" a common-law invasion of privacy claim, and, as the First Circuit has explained, "it is not [the federal court's] place to create new causes of action under state law." Spencer v. Roche, 659 F.3d 142, 150 n.6 (1st Cir. 2011); see Hernandez v. Securus Techs., Inc., No. 16–12402, 2017 WL 826915, at *3 (D. Mass. Mar. 2, 2017) (question of "whether a negligent invasion of privacy is a viable cause of action under Massachusetts law" is unresolved); Cloutier v. City of Lowell, No. 15–12780, 2015 WL 8751334, at *9 (D. Mass. Dec. 14, 2015) (dismissing common-law invasion of privacy claim because "Massachusetts does not recognize a common-law cause of action for invasion of privacy").  Even if the Court were to consider a negligence claim based on an invasion of

privacy, such a claim would nevertheless be construed under the Massachusetts Privacy Act. See Federico v. Town of Rowley, No. 15–12360, 2016 WL 7155984, at *8 n.11 (D. Mass. Dec. 7, 2016) (construing common-law invasion of privacy claim as brought under the Massachusetts Privacy Act); see also Koltin v. City of Fall River, No. 14–13749, 2015 WL 6504337, at *12 n.6 (D. Mass. Sept. 1, 2015), report and recommendation adopted in part, 2015 WL 5749455 (D. Mass. Sept. 30, 2015) (although plaintiff did not cite the Massachusetts Privacy Statute, court construed cause of action as a statutory invasion of privacy claim). As discussed above, Plaintiff has failed to state a claim under the Massachusetts Privacy Act because, among other things, the disclosed information was not sufficiently personal or intimate in nature. Her negligence claim would therefore fail for the same deficiencies. Accordingly, Count IV is dismissed.

### C.      Intentional Infliction of Emotional Distress (Count VI)

To state a claim of intentional infliction of emotional distress ("IIED"), Plaintiff must show "(1) that [defendant] intended, knew, or should have known that his conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe." Polay v. McMahon, 10 N.E.3d 1122, 1128 (Mass. 2014) (citing Howell v. Enterprise Publ. Co., 920 N.E.2d 1, 28 (Mass. 2010)). This is a "very high" standard even at the motion to dismiss stage, Santiago v. Keyes, 890 F. Supp. 2d 149, 159 (D. Mass. 2012) (quoting Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st Cir. 1996)), and requires "'targeted and malicious' conduct directed towards the plaintiff[] advancing the claim." Diaz v. Devlin, 229 F. Supp. 3d 101, 113 (D. Mass. 2017); see Nancy P. v. D'Amato, 517 N.E.2d 824, 827 (Mass. 1988) (Massachusetts case law focuses "on the emotional distress of a person against whom the extreme and outrageous conduct was directed.").

The pleadings do not suggest that the Stern Defendants intended to inflict emotional distress onto Plaintiff or knew or should have known that her alleged emotional distress would likely result from their actions. As discussed above, Agent Forsythe's tax-related statements could not be tied to Plaintiff until perhaps the final few seconds of the conversation when Agent Forsythe mentioned the telephone number. The Stern Defendants' commentary before and after Agent Forsythe realized that he was on the air focused almost entirely on Agent Forsythe, not Plaintiff. See, e.g., [ECF No. 32 at 7:13−14] ("[B]y the way, this is the most boring job ever."); id. at 7:16−17 ("I'd rather live in my parents' basement if I had to do [Agent Forsythe's job]."); id. at 9:1−2 ("[You've] got the most boring job, dude."). The few comments about the person with whom Agent Forsythe was speaking were nondescript, general, and plainly not malicious. See, e.g., id. at 9:3−4 ("What are you doing with that person? What are you paying off?"); id. at 9:13−15 ("All I know is that was the most confusing phone call and I still don't know what the guy owes."); id. at 9:16−18 ("I don't know why they need to ask all those questions. They need to pay the bill."); id. at 9:19−21 ("Right. Just give him the bottom line, Jimmy. Stop going through all the math."). Thus, Plaintiff has not plausibly stated that the Stern Defendants targeted the alleged extreme and outrageous conduct toward her.

Even if the Court accepts that Plaintiff adequately pleaded that the Stern Defendants knowingly or recklessly caused her severe emotional distress, she has not plausibly alleged that their conduct was "extreme and outrageous." The alleged conduct consists of broadcasting limited tax-related information about an unidentified individual (with the exception of a telephone number) on The Howard Stern Show and failing to respond to Plaintiff's request to

remove a recording of that segment from the show's website for a few weeks.[7] [ECF No. 46 at 10]. "Liability cannot be predicated on mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities, nor even is it enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." Polay, 10 N.E.3d at 1128 (quoting Tetrault v. Mahoney, Hawkes & Goldings, 681 N.E.2d 1189, 1197 (Mass. 1997) (internal quotation marks omitted)). "Conduct qualifies as extreme and outrageous only if it 'go[es] beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community.'" Id. (quoting Roman v. Trs. of Tufts Coll., 964 N.E.2d 331, 341 (Mass. 2012)).

None of the cases that Plaintiff offers in support of her argument present facts analogous to this case. See Simon v. Solomon, 431 N.E.2d 556, 563 (Mass. 1982) (landlord's failure to act to fix and prevent damage after plaintiff's apartment was flooded approximately 30 times); George v. Jordan Marsh Co., 268 N.E.2d 915, 916, 921 (Mass. 1971) (debt collection attempts included badgering and harassing plaintiff through late evening telephone calls and repeated letters and mailings); Vittands v. Sudduth, 730 N.E.2d 325, 335 (Mass. App. Ct. 2000) (employing meritless litigation to stop a neighbor's property development); Lingis v. Waisbren,

---

[7] Plaintiff also contends in her opposition brief that the Court should consider her "underlying anxiety condition" and "other medical conditions" that made her particularly susceptible to stress. [ECF No. 46 at 13]. She does not allege in the Amended Complaint that she already had anxiety or other medical conditions that increased her susceptibility to distress, apart from the anxiety and stress allegedly caused by this incident. She also does not allege that the Stern Defendants would have had any reason to be aware of the asserted underlying anxiety or other conditions at the time of incident. See Boyle v. Wenk, 392 N.E.2d 1053, 1056 (Mass. 1979) ("Conduct otherwise reasonable may become tortious when directed at an individual known to be particularly susceptible to infliction of emotional distress." (emphasis added)). Thus, Plaintiff has not adequately alleged any particular susceptibility to emotional distress.

No. 01−2747, 2006 WL 452942, at *6−7 (Mass. Super. Ct. Dec. 17, 2006), judgment vacated, 914 N.E.2d 976 (Mass. App. Ct. 2009) (chapter 93A claim for legal malpractice). Moreover, cases in which a privacy violation was pleaded as the basis for IIED do not support finding a plausible claim here. See Morrell v. Forbes, Inc., 603 F. Supp. 1305 (D. Mass. 1985) (publication of plaintiff's photograph without consent did not amount to extreme and outrageous conduct); French v. United Parcel Service, Inc., 2 F. Supp. 2d 128, 132 (D. Mass. 1998) (dismissing IIED claim where plaintiff failed to adequately plead an intentional invasion of privacy); see also Sorenson v. H & R Block, Inc., No. 99−10268, 2002 WL 31194868, at *18 (D. Mass. Aug. 27, 2002), aff'd, 107 F. App'x 227 (1st Cir. 2004) (independent tax preparer purposely disclosing customer's tax information to IRS for suspected tax fraud did not bear "the slightest resemblance" to extreme and outrageous conduct); compare Coughlin v. Town of Arlington, No. 10−10203, 2011 WL 6370932, at *16 (D. Mass. Dec. 19, 2011) (extreme and outrageous conduct was adequately pleaded where defendants accessed plaintiff's personal email account and disseminated highly personal messages as part of a retaliatory campaign).

For the reasons stated above, even if the Stern Defendants maintained a recording of the segment at issue on The Howard Stern Show website for a few weeks, the tax-related information contained in that recording was not highly personal or intimate. Thus, failing to respond to Plaintiff's demand and allowing the show segment to remain publicly available for a few weeks is not atrocious or utterly intolerable, as opposed to frustrating and perhaps embarrassing. See, e.g., Asfour v. Citizens Bank, N.A., No. 16−11732, 2016 WL 7428224, at *6 (D. Mass. Dec. 23, 2016), appeal filed, No. 17−1135 (1st Cir. Feb. 6, 2017) (defendant's lack of response to plaintiff's "many communications" regarding her loan modification did not constitute extreme or outrageous conduct). Although Plaintiff's receipt of harassing telephone

calls from unknown individuals is troubling, the sum of the Stern Defendants' conduct amounts to airing a three-minute radio show segment including some tax-related statements taken out of context, commenting on Agent Forsythe's job as opposed to Plaintiff's tax delinquency, and disclosing a publicly available telephone number. Under these circumstances, broadcasting the show and maintaining a recording thereof for a few weeks does not rise to the level of extreme and outrageous conduct necessary to support an IIED claim. Accordingly, the Court dismisses Count VI.

## IV.    CONCLUSION

For the foregoing reasons, the Stern Defendants' motion to dismiss [ECF No. 30] is GRANTED, and the United States' motion to dismiss [ECF No. 34] is GRANTED as to Count I. Plaintiff's case may proceed with respect to Count II against the United States.

**SO ORDERED.**

March 9, 2018                                            /s/ Allison D. Burroughs
                                                        ALLISON D. BURROUGHS
                                                        U.S. DISTRICT JUDGE